**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUN - 9 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EMEBET FIKRU
1835 North Culpepper Street
Arlington, VA  22207 and

TESFAY X. GUEBRE
1835 North Culpepper Street
Arlington, VA  22207,

     Plaintiffs,

vs.

HOUSHANG H. MOMENIAN
24510 Burnt Hill Road
Clarksburg, MD  20817,

VIDA MOMENIAN
24510 Burnt Hill Road
Clarksburg, MD  20817,

PAUL F. INTERDONATO
12301 Hatton Point Road
Fort Washington, MD  20744 and

AMELIA T. INTERDONATO
12301 Hatton Point Road
Fort Washington, MD  20744,

    Defendants.

COMPLAINT   FOR   LEGAL   AND
EQUITABLE RELIEF

JURY TRIAL DEMAND ENDORSED

CASE NUMBER  1:05CV01162

JUDGE: James Robertson

DECK TYPE: General Civil

DATE STAMP: 06/09/2005

JURY ACTION

Plaintiffs, for their complaint against the Defendants, jointly and severally, aver:

<u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

Plaintiff Emebet Fikru is a permanent residence alien domiciled in Virginia and

1

Plaintiff Tesfay Guebre is a citizen of Virginia while each of the Defendants is, on information and belief, a citizen of, or a permanent residence alien domiciled in, Maryland. The claims herein arose in the District of Columbia. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Alternatively, this Court has supplemental jurisdiction of some of the claims herein under 28 U.S.C. Sec. 1367(a).

2.    Personal jurisdiction over each Defendant is proper pursuant to Federal Rule of Civil Procedure 4 and the District of Columbia Code. Each of the Defendants claim a real estate interest in the property that is the subject of this action and also have other sufficient contacts with the District of Columbia to support such jurisdiction.

3.    Venue is proper pursuant to 28 US.C. § 1391 (a) because the property that is the subject of this action is situated in the District of Columbia and a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.

## BACKGROUND FACTS

4.    Before on or about December 21, 1998, Defendants Houshang H. Momenian and Vida Momenian, who are husband and wife, [the "Momenians"] owned two adjoining commercial properties in the District of Columbia. One of those parcels is know as 527-528 E Street, S. E. [the "527-8 Property"] and the other is known as 531 E Street, S. E. [the "531 Property"]. Together, the 527-8 Property and 531 Property will sometimes be referred to as the "Property".

2

5.    The Momenians purchased the Property in 1990 from Defendants Paul and
Amelia Interdonato [the "Interdonatos"] who are husband and wife. As part of
this purchase, the Momenians granted a deed of trust to Defendant Paul
Interdonato in the original amount of $265,000, as part of the purchase price. The
Momenians still owed some amount to Defendant Paul Interdonato, which was
secured by that deed, as of December 21, 1998.

6.    As of December 21, 1998, the Momenians also owed $190,646 on a March 14,
1996 first mortgage loan on the Property from First Union Bank in the original
amount of $172,500. On information and belief, First Union Bank, at some time
in or before June 1998, gave notice of default to the Momenians for non-payment
and intended to foreclose on its lien against the Property. That foreclosure would
have likely resulted in the Property being sold without Defendants receiving
anything for their interests in the Property. On information and belief, this was
the reason the Momenians sought to sell the Property to Plaintiffs.

7.    On or about December 21, 1998, the Momenians sold the Property to Plaintiffs,
who are wife and husband. [the "Sale"]. As part of the closing of the Sale, the
Momenians executed and delivered to Plaintiffs a warranty deed, executed on
December 21, 1998 and filed of record on December 30, 1998 [the "Warranty
Deed" attached as Exhibit A] conveying fee simple title to the Property to
Plaintiffs, as tenants by the entireties.

8.    The Sale was in performance of a real estate sale contract, in normal form, [the
"Sale Contract" attached as Exhibit B] execute by the Momenians and the
Plaintiffs on or about June 21, 1998.

3

9.  A HUD-1 Settlement Statement summarizing the closing of that sales transaction [the "Settlement Statement" attached as Exhibit C] was signed by the Momenians and the settlement attorney on December 21, 1998. The Settlement Statement was executed by the Momenians under potential criminal penalty pursuant to 18 U.S.C. sec. 1001 and 1010 as expressly referenced below their signatures. They certified that the statements contained in the Settlement Statement were "true and accurate."

10. The purchase price according to the Settlement Statement was $345,000. However, $90,000 of that was described on the Settlement Statement as an "Excess deposit" in the Summary of Seller's Transaction column and as a "Deposit or earnest money" in the Summary of Borrower's Transaction column.

11. The $345,000 purchase price was for both the 527-8 Property and the 531 Property combined, with no indication of how much of the price or value was for, or should be allocated to, each parcel

12. At the time of the Sale, the Property had a fair market value, according to two contemporaneous appraisals done for Liberty National Bank, of $325,000. Of that total, the 531 Property had an appraised, fair-market value of $150,000 and the 527-8 Property had an appraised, fair-market value of $175,000.

13. The Plaintiffs borrowed $255,000 from First Liberty National Bank, which received a first deed of trust lien on the Property. Only the Plaintiffs were obligors on that loan. That deed of trust was completely satisfied and released as a result of Plaintiffs selling the 527-8 Property on June 19, 2002 as described below.

4

14.  That first deed of trust on the Property was also on a combined basis, with no indication of how much of the loan or lien was for the purchase of, or should be allocated to, each parcel.

15.  The Settlement Statement shows only the First Liberty Bank purchase money loan of $255,000 as the "new loan" for the Sale. The Sale involved no other new loans, or existing loans taken subject to, as demonstrated by no such entries appearing on the Settlement Statement.

16.  Except for $10,654 in cash for closing costs paid by the Plaintiffs, the proceeds of the First Liberty bank loan were the only escrowed funds as shown on the Settlement Statement.

17.  The Settlement Statement also shows that those funds were released from escrow to pay-off (i) the First Union Bank first lien in the amount of $190,646, (ii) the second lien (on information and belief, that of Defendant Paul Interdonato as defined above) in the amount of $29,999, and (iii) the remaining closing costs. No other pay-offs were referenced in the Settlement Statement.

18.  As part of the closing of the Sale, the deed of trust securing Defendant Paul Interdonato's original loan to the Momenians and the deed of trust securing First Union were both satisfied and released on December 23, 1998, which was filed of record.

19.  On December 21, 1998, a purported deed of trust, in favor of Defendant Amelia Interdonato and allegedly securing a $100,000 note, [together the "Purported Interdonato Deed and Note" attached as Exhibit D.] was supposedly created. Defendant Paul Interdonato was named as the trustee. Apparently, the Purported

5

Deed and Note were executed at the same time as closing of the December 21, 1998 Sale. The notary certifying them was the settlement attorney for the closing. However, the Purported Interdonato Deed and Note is not shown or referred to the on the Settlement Statement that was sworn to be true by the Momenians.

20.    The Purported Interdonato Deed and Note are not supported by any new consideration, and there was no assignment or assumption of any debt. Plaintiffs did not receive anything of value from, or on behalf of, Defendant Amelia Interdonato or any other party. Nothing of any value was transferred or delivered by, or on behalf of, Defendant Amelia Interdonato in connection with the Sale, which is confirmed by the Settlement Statement.

21.    Nor is the Purported Interdonato Deed and Note a continuation of the earlier lien in favor of Defendant Paul Interdonato, or supported by any consideration connected therewith.

22.    The Purported Interdonato Deed and Note was executed and delivered before defendant Paul Interdonato satisfied and released the note and deed of trust in his favor as alleged above

23.    If the Purported Interdonato Deed and Note had been lawfully created on December 21, 1998, it would have been an immediate breach of the terms of the purchase money note and deed of trust in favor of First Liberty Bank, which funded the Sale.

24.    Although the Purported Interdonato Deed and Note specifically required monthly payments of $1074.71 no demand for such payments was ever made, and Plaintiffs never made such payments.

6

25.    At or about the time of the Sale, the Momenians also sold and assigned to
Plaintiffs all of the assets, including the Alcohol Beverage Commission license,
that were being used for the business Plaintiffs had been operating (as the
Momenians had before) on the 527-8 Property, and would continue to operate.
However, the Momenians did not provide a bill of sale or other documentation of
that sale and assignment to Plaintiffs.  The Momenians refused to take reasonable
steps to effectuate the sale of this personal property, including the transfer of the
ABC license, which was in Defendant Vida Momenian's name before and after
the Sale.  As a result, the ABC license was suspended several times, causing the
closing of the Plaintiffs' retail business and substantial losses.

26.    On December 4, 2000, Defendant Paul Interdonato, as the attorney for the
Momenians, acting willfully and maliciously, wrote the Plaintiffs asserting that
they were contractually obligated to convey the 531 Property to the Momenians
immediately following the December 21, 1998 closing of the Sale, of which the
531 Property was a material part.   On December 18, 2000, Defendant Paul
Interdonato told the Plaintiffs' then attorney that he had been instructed by the
Momenians to sue the Plaintiffs for their alleged failure to convey the 531
Property two years earlier.

27.    Defendant Paul Interdonato falsely and maliciously claimed that an agreement,
executed on some unstated date in December 1998 [the "Purported December
1998 Agreement" attached as Exhibit E] required the "re-conveyance" of the 531
Property "free of a first trust encumbrance."

7

28.   The Purported December 1998 Agreement bears no specific date but was signed by the Momenians some time on or before December 21, 1998.

29.   The Purported December 1998 Agreement stated that, in exchange for the Plaintiffs allegedly agreeing to "re-convey" the 531 Property, the Momenians would "in consideration of Seller [the Momenians] provid[e] the second mortgage loan of $255,000 ... on the [Plaintiffs'] property." This is the only alleged consideration ever indicated in that document or elsewhere. As is shown by the Settlement Statement, Defendants provided no second mortgage loan of $255,000 or any other financing for the Sale.

30.   The Purported December 1998 Agreement was not the basis for the Sale. Rather, the Momenians acknowledged and ratified, in writing they signed on February 27, 2001, that the parties performed under the Sale Contract by closing the Sale.

31.   The Purported December 1998 Agreement, to the extent it was ever an enforceable contract, was, inter alia: (i) willfully, maliciously and materially breached and/or not performed by the Momenians; (ii) merged into and is barred by the Warranty Deed, which contained no exceptions or reservations; (iii) abandoned, waived and/or cancelled; (iv) orally modified, (v) impossible of performance by the Plaintiff, as the Momenians always knew; and (vi) unconscionable and inequitable. Therefore, the Purported December 1998 Agreement if formed, was invalid and/or unenforceable.

32.   Prior to and continuing after these demands, the Momenians willfully and maliciously never fully performed their obligations to transfer the ABC License and properly convey the store fixtures, equipment and other personal property.

Shockingly, Defendant Houshang Momenian, acting willfully and maliciously, continued to behave after the Sale as if he still owned the Property, including not only the 531 Property but also the 527-8 Property. For example, falsely, willfully and maliciously claiming to be the owner of 527-8 Property, he "rented," at various times after December 21, 1998, certain portions of the 527-8 Property, then owned by Plaintiffs, to tenants without any right to do so, willfully and maliciously keeping the rents for himself. Defendant Momenian never accounted for or paid over the rents he received to Plaintiffs who were clearly the only owners of the 527-8 Property. He falsely, willfully and maliciously told Plaintiff Fikru repeatedly that he continued to own the 527-8 Property and that she should not tell anyone that she and her husband owned it. Again acting willfully and maliciously, he also intimidated and harassed Plaintiff Fikru during this period.

33.    As a result of Defendant Paul Interdonato's willful and malicious threats of litigation on behalf of the Momenians, which the Plaintiffs did not realize were frivolous, and to stop Defendant Houshang Momenian's outrageous conduct toward them and their property, Plaintiffs felt required to accept the Momenians' demands. Plaintiffs did not appreciate that the Momenians were offering in exchange for their overreaching demands only that which Plaintiffs were already entitled to, including for Defendant Houshang Momenian to behave lawfully. Plaintiffs, however, believed that they could only get a transfer of the ABC License, which was critical to their retail business, by acceding to the Momenians' inequitable demands and threats.

9

34.    In the spring and summer of 2001, Plaintiffs were desperately seeking relief from the Alcohol Beverage Commission and defending a claim by a potential buyer for their business that they had misrepresented the status of the ABC license. At the same time, and for those reasons, Plaintiffs executed on or about March 24, 2001 an Agreement [the "2001 Agreement" attached as Exhibit F]. The Agreement provided that a certain lease [the "2001 Lease;" an undated copy of which is attached as Exhibit G] and a certain non- recourse note and deed of trust [the "2001 Note and Deed;" unsigned, undated copies of which are attached as combined Exhibit H]. The 2001 Agreement, the 2001 Lease and the 2001 Note and Deed will sometimes be referred to as the "2001 Documents."

35.    Although undated, the 2001 Lease was apparently not signed until some time after July 2, 2001 when it appears to have been drafted. Similarly, the 2001 Note and Deed, if signed, were apparently not drafted until August 2001.

36.    The 2001 Agreement, inter alia, provided in substance that: (i) the Momenians would provide the bill of sale for the December 1998 personal property transfer, use best efforts to cause the transfer of the ABC license and indemnify against the Purported Interdonato Deed and Note; and (ii) the Plaintiffs were to deed the 531 Property to the Momenians or suffer various penalties. Those penalties were embodied, inter alia, in the 2001 Lease and 23001 Note and Deed.

37.    The 2001 Lease provided in substance that after its execution and delivery, necessarily not before July 2001, the Momenians would "lease" the 531 Property for a rental of only $10. per year to the Plaintiffs. Those rental payments have never been made by the Momenians.

10

38.   The 2001 Note and Deed provided in essence that the Plaintiffs promised to pay the Momenians $400,000 on or before December 21, 2003. However, the Momenians were only to "look solely to the property which is the subject of the Deed of Trust for satisfaction of this Note and the Holder shall not otherwise have recourse against" the Plaintiffs.

39.   The Plaintiffs never received $400,000, any other amount or any other consideration from the Momenians for the 2001 Note and Deed.

40.   The 2001 Lease and the 2001 Note and Deed were each an express, material and necessary part of the 2001 Agreement, and were dependant, as well as conditional, upon performance by the Momenians of the 2001 Agreement.

41.   There was no, or, at least, insufficient, consideration for the 2001 Documents. The Plaintiffs received nothing they did not already have the right to receive from the Momenians in December 1998. Even the indemnity against the illegal, invalid and unenforceable Purported Interdonato Note and Deed, which the Momenians had willfully and malicious caused the Plaintiffs to sign, was an obligation the Momenians already had, because of the circumstances under which that purported instrument was allegedly created.

42.   As alleged above, the Purported Interdonato Deed and Note were not effectively formed, are not supported by consideration and is otherwise not enforceable. The Purported Interdonato Deed and Note resulted from the wrongful actions of the Defendants.

43.    Because of the circumstances of its alleged formation, as well as the inequitable conduct of Defendants, Plaintiffs have the right in equity to rescind and cancel the Purported Interdonato Deed and Note and to have it stricken from the records.

44.    Furthermore, the 2001 Lease is also not enforceable since it is an illegal penalty and also patently unconscionable.  For example, it provides for a Ten Dollar ($10.) annual rent for a maximum term, including option periods, of 60 years. The current annual, fair-market rental value is, at least, Twenty-Five Thousand Dollars ($25,000), which is the approximate amount the Momenians have been receiving from a pizza shop that has been using a portion of the 531 Property under a "lease" from the Momenians' unincorporated, shell company, Timeco.

45.    The 2001 Documents, to the extent they were ever enforceable, inter alia:  (i) were materially breached and/or not performed by the Momenians, as alleged below; (ii) were impermissible and illegal penalties; (iii) were unconscionable and inequitable and (iv) had been abandoned, waived, and/or cancelled.  Therefore, the 2001 Documents, even if properly formed, were each invalid and/or unenforceable.

46.    On June19, 2002, the Plaintiffs sold the 527-8 Property to a bono fida purchaser for fair market value.  The Defendants were aware of this transaction prior to its closing.

47.    Prior to the closing of that June 19, 2002 sale, Defendants willfully and maliciously demanded that Plaintiffs pay-off the Purported Interdonato Deed and Note in the amount of $100,000 plus interest.  The Interdonatos, acting willfully and maliciously, ultimately released it for $50,000, but only as to the 527-8

Property. The Plaintiffs had no choice but to pay the Interdonatos that money from the proceeds of the sale of the 527-8 Property.

48.     Although the Momenians were aware of these arrangements, and were required by the terms of the 2001 Agreement to indemnify the Plaintiffs for this payment, the Momenians willfully and maliciously never have done so, despite demand. This was an intentional, malicious and material breach of not only the 2001 Agreement, but also the 2001 Lease and the 2001 Note and Deed, which are material, dependant parts thereof, and conditional on its due performance.

FIRST COUNT

[Against all Defendants and Seeking Declaratory Relief to Clear Title of the 531 Property]

49.     Plaintiffs incorporate all the allegations set forth in paragraphs 1-48 above.

50.     Plaintiffs have entered in to a written, definitive contract to sell the 527-8 Property to a bono fida, third-party purchaser for fair market value in excess of $400,000 [the "Buyer"].

51.     The Buyer has declined to close that sale because he was told, willfully and maliciously, by Defendant Momenian that he still owned the 527-8 Property and would prevent its sale by Plaintiffs. Again acting willfully and maliciously, he also gave the Buyer copies of the Purported December 1998 Agreement, the 2001 Agreement, the 2001 Lease. None of those documents had ever been filed of record. The Buyer also became aware of the Purported Interdonato Deed and Note through a records search. His title company has taken the position that it

13

could not issue a good title report in these circumstances. The potential sale is on hold pending the outcome of this action.

52.    As a direct result of Defendants' willful and malicious actions and failures described above, an actual and justiciable controversy exists between Plaintiffs and Defendants as to:  (i) the validity and enforceability of the Warranty Deed granting Plaintiffs fee simple title to the 531 Property; (ii) Plaintiffs ability to sell the 531 Property in fee simple; and (iii) the possession, use and enjoyment of the 531 Property.  Accordingly, a declaratory judgment is necessary to confirm Plaintiffs' rightful ownership of the Property, free and clear of any liens of, or claims by or through, any of the Defendants.

53.    The Purported December1998 Agreement and each of the 2001 Documents, for the reasons stated above, were not effectively formed, are void or voidable and/or are not otherwise valid or enforceable.  The requested declaratory judgment would necessarily also determine that (i) each of the 2001 Documents is of no force or effect, (ii) Plaintiffs are entitled to rescission of each, and (iii) each should be cancelled.

54.    The proposed declaratory judgment would also confirm that the Plaintiffs have good, valid and enforceable, fee-simple title to the Property, free of any liens or claims created by or through any of the Defendants.

55.    Defendants' inequitable actions, as shown above, are ongoing and are continuing to inflict irreparable harm upon Plaintiffs as to which there exists no adequate remedy at law.

SECOND COUNT

14

[Against all Defendants and Seeking Monetary Relief for Slander of Title]

56.    Plaintiffs incorporate all the allegations set forth in paragraphs 1-48 and 50-55 above.

57.    The Defendants willful and malicious actions, as alleged above, have slandered Plaintiffs good, fee simple title to the 531 Property.

58.    The Momenian Defendants, as alleged above, have willfully and maliciously on repeated occasions claimed that they owned the 531 Property after December 21, 1998 and that the Purported Interdonato Deed and Note was valid and enforceable.  These statements were made to various third persons, including the Buyer and the current occupants of the 531 Property.

59.    The Interdonato Defendants also have willfully and maliciously on repeated occasions claimed that the Momenians owned the 531 Property after December 21, 1998 and that the Purported Interdonato Deed and Note was valid and enforceable.

60.    As a direct and proximate result of these willful, malicious, and non-privileged statements by Defendants, Plaintiffs have been and are being injured, including by (i) having their sale of the 531 Property impeded and delayed and (ii) having to bear the cost and delay of this remedial action.

61.    Some of the substantial injuries Plaintiffs have suffered, and are continuing to suffer, are difficult, if not impossible to calculate with precision, but are believed to be in excess of $100,000.

## THIRD COUNT

[Against the Momenian Defendants and Seeking Monetary Relief for Trespass]

62.    Plaintiffs incorporate all the allegations set forth in paragraphs 1-48, 50-55, and 57-61 above.

63.    As described above, the Momenians are exercising dominion and control over the 531 Property, and excluding Plaintiffs from their rightful possession, use and enjoinment.

64.    The Momenians claim the right of possession based on the 2001 Lease. As shown above the 2001 Lease is void or, at least, voidable, because of the circumstances of its creation, its lack of sufficient consideration and the intentional, material breaches, including that of its foundation, the 2001 Agreement.

65.    Furthermore, the 2001 Lease is also not enforceable since it is an illegal penalty and also patently unconscionable. For example, it provides for a Ten Dollar ($10.) annual rent for a maximum term, including option periods, of 60 years. The current annual, fair-market rental value is, at least, Twenty-Five Thousand Dollars ($25,000), which is the approximate amount the Momenians have been receiving from a pizza shop for the unauthorized use of a portion of the 531 Property.

66.    Even if the 2001 Lease were valid, it only applies by its terms to the period after it was signed, i.e., sometime in or after August 2001. The Momenians had no right to possession of, or to rent or otherwise use, the 531 Property on and after December 21, 1998. Nor is there any writing, as required by the Statute of

Frauds, granting the Momenians any such rights prior to, arguendo, August 2001 or later. However, the Momenians, through an unincorporated shell entity called Timeco illegally entered into a purported lease on December 22, 1998 for a portion of the 531 Property prior to the recording of the Warranty Deed. This purported Timeco lease was done without any right and without Plaintiffs' knowledge or consent.

67. From December 22, 1998 until the present or, at least, August 2001, the Momenians, acting willfully and maliciously, trespassed upon the 531 Property, including by "renting" it and allowing that "tenant" and its invitees to use it, to the exclusion of Plaintiffs.

68. During that period, the Momenians have received, through presumably Timeco, approximately $145,000 under that purported December 22, 1998 lease, and they continue to receive more than $2,000 per month. The Momenians should be required to account for and disgorge all amounts they have received as a result of their trespass.

69. As a result of the Momenians trespass on the 531 Property, Plaintiffs have suffered damages, including for the loss of use and enjoyment together with mesne profits, in an amount to be shown at trial, but believed to be more than One Hundred and Fifty Thousand Dollars ($150,000.).

70. Defendants' inequitable actions in trespassing upon the 531 Property, as shown above, are ongoing and are continuing to inflict irreparable harm upon Plaintiffs as to which there exists no adequate remedy at law.

FOURTH COUNT

17

[Against the Interdonato Defendants and Seeking Monetary and Equitable Relief as to

Partial Payment of the Purported Interdonato Deed and Note]

71.  Plaintiffs incorporate all the allegations set forth in paragraphs 1-48, 50-55, 57-61
     and 63-70 above.

72.  As alleged above, the Purported Interdonato Deed and Note was not effectively
     formed, is not supported by consideration and is otherwise not enforceable.  The
     Purported Interdonato Deed and Note resulted from the wrongful actions of the
     Defendants.

73.  Because of the circumstances of its alleged formation, as well as the inequitable
     conduct of Defendants, Plaintiffs, as alleged above, have the right in equity to
     rescind and cancel the Purported Interdonato Deed and Note and to have it
     stricken from the records.

74.  Plaintiffs also have the right to a disgorgement of the $50,000 they did not owe
     and mistakenly paid to the Interdonatos in reliance upon their willful, malicious
     and false claims as to the validity and enforceability of the Purported Interdonato
     Deed and Note.

75.  To allow the Interdonatos to retain that amount, under these circumstances would
     be inequitable and result in an unjust enrichment of the Interdonatos.

76.  Defendants' inequitable actions, as shown above, are ongoing and are continuing
     to inflict irreparable harm upon Plaintiffs as to which there exists no adequate
     remedy at law.

18

## FIFTH COUNT

[Alternatively, Against the Momenian Defendants for Monetary and Equitable Relief for

Indemnification of Amounts Paid to Release the Purported Interdonato Deed and

Note]

77.    Plaintiffs incorporate all the allegations set forth in paragraphs 1-48, 50-55, 57-61,

63-70 and 72-76 above.

78.    It the Court does not declare, or otherwise find, that the 2001 Agreement is void,

rescinded, cancelled or otherwise unenforceable, a cause of action would then

accrue to Plaintiffs against the Momenians for their material breach of the 2001

Agreement.

79.    Plaintiffs materially breached the 2001 Agreement on or about June 19, 2002

when Plaintiffs paid the Interdonatos $50,000 for which the Momenians did not

indemnify the Plaintiffs as provided for in the 2001 Agreement.

80.    Moreover, Plaintiffs are entitled to be indemnified for the remaining amount

owing, if any, on the Purported Interdonato Deed and Note, which is still shown

to be a recorded lien on the 531 Property. The Momenians have repudiated their

responsibility to so indemnify Plaintiffs.

81.    The Momenians actions in breaching and repudiating their obligations were

willful and malicious.

82.    As a result of Defendants' material breach, and anticipatory material breach,

Plaintiffs have suffered injury in an amount to be shown at trial, but believed to be

at least, $100,000.

19

## SIXTH COUNT

[Alternatively, Against the Momenian Defendants and Seeking Monetary and Equitable

relief for Unjust Enrichment]

83.    Plaintiffs incorporate all the allegations set forth in paragraphs 1-48, 50-55, 57-61,

63-72, 73-76 and 78-82 above.

84.    If, despite all the law and facts to the contrary, the fee simple title to the 531

Property were not found to be held by the Plaintiffs, a cause of action would then

accrue to them against the Momenians for unjust enrichment, for two separate

inequities.

85.    The first inequity would be that if the Momenians were the true owners the 531

Property after December 21, 1998, they would own it free and clear of liens,

encumbrances and costs paid by the Plaintiffs at the closing of the Sale.

86.    Plaintiffs paid off all liens and encumbrances on the 531 Property, from their cash

and loan proceeds, at the closing of the Sale.  As shown on the Settlement

Statement, from Plaintiffs' loan proceeds of $255,000 and their cash paid at

closing of $10,654.50, all liens and encumbrances attaching to the Property (both

the 531 Property and the 527-8 Property) were paid-off in the total amount of

$220,645.48 plus payment of total closing costs of $45,442.

87.    Assuming the Momenians actually owned the 531 Property after the Sale,

Plaintiffs total pay-off of amounts jointly charged to the entire Property increased

the net value of the 531 Property to the Momenians.

20

88.    Since Plaintiffs' money went to pay joint liens and encumbrances, as well as the indivisible transaction costs, equitable marshalling would be the appropriate way to divide and separate amounts paid by Plaintiffs to the benefit of either the 531 Property or the 527-8 Property.

89.    From the ratio of value shown by the lender's contemporaneous appraisals [the "Appraisals" material portions of which are attached as Exhibit I], the value of the 531 Property was 46% of the total value of the Property, including the 527-8 Property.

90.    Thus, 46% of the paid-off liens ($101,827) and 46% of the closing costs ($20,971) would be fairly attributable to the 531 Property.

91.    These amounts, totaling $122,798, were paid mistakenly, at the very least, by Plaintiffs in reliance on the statements of the Momenians and their agents. These payments were to the Momenians, or their creditors, for the benefit of the 531 Property and the Momenians if they were its prospective owners, and to the detriment of the Plaintiffs, if they were not actually to be its owners

92.    To allow the Momenians to retain that amount, under these circumstances, would be inequitable and result in an unjust enrichment of the Momenians by, at least, $122,798.

93.    The Momenians should disgorge the amount of $122,798 to Plaintiffs, which they did not owe and mistakenly paid to, or on behalf of, the Momenians in reliance upon their willful, malicious and false claims as to the Sale. Alternatively, Plaintiffs should recover damages in that amount. In either case, a constructive trust and/or equitable lien should be imposed upon the 531 Property to protect

21

Plaintiffs from the injurious results of the inequitable and malicious conduct of the Momenians.

94.    A cause of action for unjust enrichment would also then accrue for a second inequity arising form the willful and malicious actions of the Momenians in connection with the Sale, assuming again that they are now the true owners of the 531 Property.

95.    Again as shown on the Settlement Statement, Plaintiffs paid slightly more that $346,000 for the Property. If they only really received fee simple title to the 527-528 Property, then that amount would have been the true purchase price of only that part of the Property.

96.    But the 527-8 Property alone was contemporaneously appraised, in the Appraisals, to have a fair market value of only $175,000. Thus, on these assumptions, Plaintiffs paid more than $170,000 in excess of the value of the 527-8 Property - - almost twice what the 527-8 Property was worth at the time.

97.    If the Plaintiffs also do not recover the $50,000 they paid to remove the Purported Interdonato Note and Deed encumbrance on the 527-528 Property prior to its sale in June 2002, then the Plaintiffs will have effectively paid more than $220,000 beyond the amount at which the 527-8 Property was objectively valued in December 1998.

98.    To allow the Momenians to retain that excess purchase amount, under these circumstances, would be inequitable and result in an unjust enrichment of the Momenians by, at least, $170,000.

99.    The Momenians should disgorge that amount to Plaintiffs, which they mistakenly paid to, or on behalf of, the Momenians in reliance upon their willful, malicious and false claims as to the Sale. Alternatively, Plaintiffs should recover damages in that amount. In either case, a constructive trust and/or equitable lien should be imposed upon the 531 Property, and the Sales Contract and the Sale should be reformed to reflect a fair market price, all to protect Plaintiffs from the injurious results of the inequitable and malicious conduct of the Momenians.

100.    Defendants' inequitable actions, as shown above, are ongoing and are continuing to inflict irreparable harm upon Plaintiffs as to which there exists no adequate remedy at law.

WHEREFORE, the Plaintiffs pray for the following declaratory, legal, equitable and exemplary relief:

1. As to the First Count Against all Defendants, Jointly and Severally:

    a.    a declaratory judgment that the Plaintiffs hold good, fee simple title to the 531 Property, free and clear of any interests of or through any of the Defendants including the 2001 Documents and the Purported Interdonato Note and Deed;

    b.    a declaratory judgment that each of the 2001 Documents are void, rescinded, cancelled and/or unenforceable;

    c.    a judgment for exemplary damages in the amount shown to be just at trial, but at least $1,000,000;

23

    d.  a judgment for costs and expenses, including Plaintiffs' reasonable legal fees and expenses; and

    e.  such other legal or equitable relief that the Court finds just and proper.


2.  As to the Second Count Against all Defendants, Jointly and Severally:

    a.    a money judgment for compensatory damages in the amount proven at trial but at least $100,000;

    b.    a judgment for exemplary damages in the amount shown to be just at trial, but at least $1,000,000;

    c.    a judgment for costs and expenses, including Plaintiffs' reasonable legal fees and expenses; and

    d.    such other legal or equitable relief that the Court finds just and proper.


3.  As to the Third Count Against the Momenian Defendants, Jointly and Severally:

    a.    a money judgment for compensatory damages in the amount proven at trial but at least $150,000 plus interest from or after December 22, 1998;

    b.    a judgment for exemplary damages in the amount shown to be just at trial, but at least $1,000,000;

    c.    a judgment for costs and expenses, including Plaintiffs' reasonable legal fees and expenses; and

    d.    such other legal or equitable relief that the Court finds just and proper.


4.  As to the Fourth Count Against the Interdonato Defendants, Jointly and Severally:

  a.  a money judgment for damages in the amount proven at trial but at least

     $50,000 plus interest from June 19, 2002;

  b.  a judgment requiring the Interdonato Defendants to disgorge all moneys

     that they received from the Plaintiffs on the Purported Interdonato Note

     and Deed including interest;

  c.  a judgment for exemplary damages in the amount shown to be just at trial,

     but at least $1,000,000;

  d.  a judgment for costs and expenses, including Plaintiffs' reasonable legal

     fees and expenses; and

  e.  such other legal or equitable relief that the Court finds just and proper.

5. Alternatively, as to the Fifth Count Against the Momenian Defendants, Jointly and

 Severally:

  a.  a money judgment for damages in the amount proven at trial but at least

     $50,000 plus interest from June 19, 2002;

  b.  a judgment requiring the Momenian Defendants to indemnify and hold

     harmless the Plaintiffs from any liability or expense as to the Purported

     Interdonato Note and Deed including interest;

  c.  a judgment imposing a constructive trust or equitable lien on any interest

     of the Momenian Defendants in 531 Property to protect Plaintiffs;

  d.  a judgment for exemplary damages in the amount shown to be just at trial,

     but at least $1,000,000;

25

    e.    a judgment for costs and expenses, including Plaintiffs' reasonable legal fees and expenses; and

    f.    such other legal or equitable relief that the Court finds just and proper.

6.  Alternatively, as to the Sixth Count Against the Momenian Defendants, Jointly and Severally:

    a.    a money judgment for damages in the amount proven at trial but at least $298,798 plus interest from December 21, 1998;

    b.    a judgment imposing a constructive trust or equitable lien on any interest of the Momenian Defendants in 531 Property to protect Plaintiffs;

    c.    a judgment for exemplary damages in the amount shown to be just at trial, but at least $1,000,000;

    d.    a judgment for costs and expenses, including Plaintiffs' reasonable legal fees and expenses; and

    e.    such other legal or equitable relief that the Court finds just and proper.

Respectively submitted,

Glenn M. Young, Esquire
D. C. Bar Number 355347

The Young Law Firm
P.O. Box 6251
Washington, D.C.  20015-6251
(202) 494-8082
Fax:  (202) 318-2495

ENDORSED JURY TRIAL DEMAND

Plaintiff hereby demands trial by jury of all claims herein so triable.

Glenn M. Young
Counsel for Plaintiffs